2022 IL App (2d) 200162-U
No. 2-20-0162
Order filed April 19, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17 CF 1659 |
| KONNOR W. BURNS, | ) ) | Honorable John J. Kinsella, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   At defendant's trial on domestic-abuse charges involving his live-in girlfriend, the trial court did not err in admitting evidence that, 10 years before the charged offenses, defendant assaulted a different victim, his girlfriend at the time.

¶ 2   Defendant, Konnor W. Burns, appeals from his conviction of domestic battery (720 ILCS 5/12-3.2(a)(l)) (West 2016)) for striking B.V. and causing her bodily harm.  He contends that the trial court abused its discretion in admitting other-crimes propensity evidence under section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4(b) (West 2016)).  The court admitted evidence of defendant's prior aggravated battery of his then-girlfriend, S.B., when

he was 17 years old, a little more than 10 years before the offense at issue. He argues that (1) the offenses were not sufficiently similar under section 115-7.4 as they shared only characteristics common to most domestic batteries, (2) the propensity evidence was improperly used to bolster B.V.'s credibility, and (3) the court did not give proper weight to the time gap between the offenses and his youth when he committed the prior offense. We disagree with defendant on the first two points. Further, we conclude that the time-gap and youth-factors were, by themselves, insufficient to make admission of the propensity evidence an abuse of discretion. We therefore affirm.

¶ 3                                     I. BACKGROUND

¶ 4     A grand jury indicted defendant on one count each of aggravated domestic battery (720 ILCS 5/12-3.3(a-5), (b) (West 2016)) (strangulation of B.V.) and domestic battery (720 ILCS 5/12-3.2(a)(l)) (West 2016)) (striking B.V., causing bodily harm). Both offenses allegedly occurred on August 16, 2017. The record indicates that defendant's birthdate is July 22, 1989.

¶ 5     The State moved under section 115-7.4 of the Code to introduce, as evidence of defendant's propensity for domestic violence, testimony regarding his prior acts of domestic violence against other individuals, S.B. (formerly S.T.) and M.R.

¶ 6     The State anticipated that it would prove the following at trial in this case:

        "[B.V.] and the defendant were in a dating relationship. On the early morning hours
        of August 16, 2017, [B.V.] arrived home from work, and the defendant initiated a verbal
        altercation that turned violent. During his attack, the defendant accused [B.V.] of cheating.
        The defendant was irate, trashing [B.V.]'s apartment and breaking a window and door. He
        strangled [B.V.] by the neck. [B.V.] lost consciousness. The defendant also punched and
        kicked [B.V.] about her head and body repeatedly, which resulted in swelling and bruising.
        [B.V.] begged the defendant to stop. The defendant also threatened [B.V.] if she called the

police. He ultimately took her cell phone from her. Eventually, [B.V.] escaped the apartment and went to the hospital for medical treatment. Hospital records confirm strangulation marks on [B.V.] as well as swelling and bruising about the face and body."

¶ 7 The State described the incident involving S.B.:

"[S.B.] and the defendant were in a dating relationship. On March 22, 2007, [S.B.] was at a friend's apartment having lunch. The defendant drove by threatening to kill [S.B.] and her friend. At one point, the defendant climbed up the balcony to get to [S.B.] He left when he was told the police were being called. The defendant was able to grab [S.B.]'s cell phone prior to leaving. The defendant used the cell phone to lure [S.B.] back to his residence. When she arrived, he gave [S.B.] her cell phone back and then threw mud in her face. The [S.B.] began to cry and entered the defendant's [house] to wash her face off in the bathroom. The defendant confronted [S.B.] about the friends she was hanging out with, believing [S.B.] was cheating on him. At this time the defendant punched [S.B.] in the head with a closed fist. [S.B.] fell to the ground and curled up in a ball while the defendant screamed at her uncontrollably. She remained on the ground terrified when the defendant exited the bathroom and punched a picture that hung on the wall. The picture frame shattered. The defendant walked back to the bathroom and punched the door, which also broke. The defendant then shattered another picture frame. The defendant was charged and convicted of this offense in DuPage County case numbered 07DV498."

¶ 8 The State described two incidents involving M.R.:

"[M.R.] and the defendant were in a dating relationship for approximately two and half years. [M.R.] lived part-time with the defendant at his family's residence in Naperville, Illinois. On March 5, 2011, [M.R] was sleeping in the basement at the

defendant's house. The defendant arrived home around 3 [a.m.] intoxicated. The defendant punched [M.R.] in the face out of nowhere. He became irate and accused [M.R.] of cheating on him, calling her a 'whore' and a 'slut'. The defendant shattered a flower vase in the room. [M.R.] screamed for help in the basement and was eventually able to escape from the house. She went to a hospital to received [*sic*] medical treatment for her injuries, which included a laceration and contusion [*sic*] her eye and nose. Following the attack, the defendant called [M.R.]'s sister and threatened to slit her throat and kill her and her unborn child. This case was charged in DuPage County case numbered 11DV309.

On March 26, 2009, the defendant also violently attacked [M.R.]. The defendant pushed her against the wall, ripped a chain off her neck and choked her. The defendant then chased [M.R.] with a tire iron. The defendant hit [M.R.'s] vehicle with the weapon. This case was charged in DuPage County case numbered 09DV452."

¶ 9 Defendant responded that, because the two prior acts involving M.R. did not result in a conviction—the complaining witness did not appear at the trial—the evidence of the acts was unreliable. He also argued that the offense involving S.B. was too remote because it occurred more than 10 years before the offenses charged here. Further, "the alleged factual similarities identified by the State are not that significant." "[T]hat these [acts] all were from dating relationships and that the defendant was violent and enraged means nothing because such facts are common to all domestic violence cases." "The only facts that are not inherent in the offense and that are common in all cases ***, are (1) the alleged breaking of items during the encounters, (2) the alleged punching to the head, and (3) post-incident threats."

¶ 10     The court granted the State's motion to admit the prior acts, finding that (1) they were more than sufficiently similar to the charged acts and (2) the 10-year interval since the acts involving S.B. was not dispositive:

> "[I]n reading and reviewing the incidents involved, I find them strikingly similar, although probably falling short of *modus operandi* in the sense it's normally used to show one's identification as a perpetrator of an offense because they have committed identical offenses in the past. ***
>
>             ***
>
>     There is some question of time. I don't find it dispositive in terms of admissibility. The incidents are several-years old. And, I think, it's relevant that there are other incidents that the State is not seeking admission of in terms of weighing the probativeness versus the prejudicial effect, which is, certainly, part of the evaluation of the question to be addressed.
>
>     But there is factual similarity. The proximity, I think, is sufficient in terms of being admissible.
>
>     And it would be relevant to establish that the defendant has engaged in a pattern of behavior and conduct of physically abusing women with whom he was in a relationship. And these would be two other women that he had relationships with in [*sic*] the past."

¶ 11     At defendant's jury trial, the State presented evidence of the battery of S.B. but not the battery of M.R. In its opening statement, the State first described what it expected to prove defendant had done to B.V. The State then remarked that defendant had done something similar before, to S.B.:

"This isn't the first time the defendant flew into a fit of rage and beat up a girlfriend. He's done this before to [S.B.] *** When this defendant gets angry he deals with it by beating up a girlfriend, by destroying property, that's his response to anger."

¶ 12 In his opening statement, defendant asserted that the evidence would show that B.V. got into a fight with him because he would not give her his prescription drugs. He also argued that B.V. had a propensity to lie and that the evidence would show that, "when confronted with something that doesn't fit her story, she comes up with a new story."

¶ 13 B.V. was the first witness for the State. She testified that, in August 2017, she was working as a server at "Empire," which was later identified as Empire Burgers and Brew (Empire). She had been dating defendant for a few months, and they lived together in her apartment. On August 15, 2017, she finished her shift at 10 or 11 p.m. She did not go home immediately when she finished. Defendant started to text her, asking in profane language why she had not yet returned.

¶ 14 Sometime after midnight, she returned to her apartment. Defendant came up to her as she entered and screamed at her for her delayed return. B.V. walked to the bedroom to change out of her work clothes. Defendant followed her, screaming and calling her names; she commented, "He was up for days at that point so he was not in the best mood." Among the things he screamed at her was an accusation that she was cheating on him. Defendant then started throwing "random things."

¶ 15 B.V. went into the bathroom and locked the door. Defendant, after screaming for B.V. to open the door, eventually broke it open, then hit her with "a closed fist across the face." He hit her face about three more times; she fell into the shower, striking the back of her head against the tiles on the wall.

¶ 16     B.V. testified that she then ran to the living room, intending to pick up her car keys and phone so she could leave. Defendant followed her into the living room and took the phone and keys from her. He then grabbed her by her arms and threw her to the ground, where he pinned her, sitting on her and holding her arms out. She "was screaming really loud at that point because he kept punching [her] really hard in the face and the ear and nose." Defendant shoved something made of cloth in her mouth, covered her mouth with his hand, and told her that, if she kept screaming, he was "going to fucking kill [her]." He then put his hands around her neck and started choking her. She felt that she could not breathe and blacked out. As she described it, "The last thing I remember before I lost consciousness was him looking into my eyes and saying 'I'm going to fucking kill you.' "

¶ 17     B.V. testified that, when she regained consciousness, she left the apartment and drove herself to the hospital. Someone at the hospital called the police. Officers arrived and photographed her injuries. In photographs admitted at trial, B.V. identified bruising on her face, a cut inside her mouth, marks on her neck, rug burns on her elbow, and bruising on her legs. She attributed these injuries to defendant's attack on August 16, 2017.

¶ 18     When B.V. returned from the hospital, she discovered damage to her apartment including a broken bathroom door and a damaged kitchen sink. She identified the damage in photographs admitted at trial; for instance, the spigot in the kitchen sink was detached and the bathroom door was damaged at the hinge. Another photograph showed items strewn about the living room. She claimed that the living room was "[n]ot exactly like that" before defendant started yelling at her and throwing things. He also threw things around her bedroom and punched a hole in the side of her dresser, causing the side panel to fall off.

¶ 19    On cross-examination, B.V acknowledged speaking with Officer John Stull[1] shortly after she returned from the hospital. She remembered giving her version of the events, but she was concussed at the time and could not recall what she said. She agreed that she tried to be as accurate and complete as possible when she gave the statement. She denied telling Stull that she and defendant had been dating for two years before the incident. B.V. guessed that defendant had moved into her apartment "a couple [of] months" before the incident, and she admitted that defendant had cosigned the lease.

¶ 20    B.V. denied that she regularly got bumps and bruises as a server at Empire. She was sure that she had worked the night of August 15, 2017, and she believed that she had worked the previous night as well. She agreed that Empire kept accurate payroll records. She finished work at 11 p.m. on August 15 or 12 a.m. on August 16. She did not recall exactly what she did after work, but she believed that she "either ran errands or hung out at work like [she] would normally do." She denied that she went to the home of someone named "Louis" or "Mighty" after work. She had not shown the police the texts defendant sent her on the night of August 15 into August 16 because she wanted to move on with her life and have nothing more to do with the situation. Six months after the incident, her phone was stolen and she was no longer able to access the texts.

¶ 21    Questioned further about her statement to Stull, B.V. testified that she told him that she was "running errands" after work, not that she was "running around." B.V. reiterated that she was concussed while speaking with Stull and that this affected her memory of the interview. She

---

[1] During her cross-examination, B.V. periodically claimed that she did not recall speaking to Officer Stull, yet at other times she acknowledged their interview and purported to recall what she told him.

testified that she would not typically run errands at that time of night and might have stayed at work to avoid going home. She denied telling Stull that defendant wanted to go to his grandmother's house at around 4 a.m. on August 16, 2017. She claimed, however, that defendant did sometimes run errands that early. She could not recall defendant biting her on the wrist but said that, if that was what she told Stull, then it was correct. She did not recall telling Stull that defendant threatened to kill her. She also did not recall telling Stull that defendant stuffed a cloth in her mouth, but she did recall telling him that she was not able to breathe at a point during the attack.

¶ 22 B.V. further testified that she probably told officers what medications defendant was taking—Adderall and Xanax—including the specific doses. She agreed that she had sometimes filled prescriptions on his behalf. She acknowledged that she went to drug rehabilitation in 2018 but claimed that her substance abuse developed in response to the August 2017 incident.

¶ 23 B.V. stated that, before her testimony, she reviewed an audio recording of a statement that she gave detectives. She attested that the recording was accurate. For impeachment purposes, the audio was played in court, and B.V. admitted that she told the detectives that defendant "punched [her] in the face with a closed fist hard six times."

¶ 24 The State next called S.B., who testified that, in 2007, when she was 17 years old, she was in a dating relationship with defendant. In March 2007, she had been dating defendant for about six months. On March 22, 2007, at noon, she, Scott Burford (a school friend), three other friends, and Burford's grandmother were having lunch on the balcony of Burford's second-floor apartment. Defendant started texting her, telling her that he did not want her to be at Burford's home and that she should come outside. He then stopped his Hummer in front of the apartment and started yelling for her to come out. He threatened to kill S.B. and burn her parents' house down. He eventually

left but came back three or four minutes later and started yelling again, this time demanding that Burford let him into the building. When Burford refused, defendant started climbing from a first-floor balcony to Burford's balcony. He yelled that he was going to kill them and that S.B. was going to regret being at Burford's home. Burford's grandmother told defendant that, if he did not leave, she would call the police. Defendant jumped to the ground, got in his vehicle, and drove away.

¶ 25     By then, S.B. and her friends had to leave to get back to their classes. As she was getting into the back seat of a friend's car, defendant "came flying up in the Hummer" and blocked her friend's car. He came so close that S.B. thought that he was going to hit the car. Defendant jumped out of his Hummer, reached through the open back window—which S.B.'s friend was trying to close—and grabbed S.B.'s cell phone off her lap. Defendant told S.B. that the only way that she was going to get her phone back was to go to his house.

¶ 26     S.B. had her friend drive to defendant's house. Defendant was in the front yard when they arrived, holding her phone. When S.B. went to take it from his left hand, he slapped her in the face with his right hand, which was full of mud. As a result, she had half of her face and part of her hair covered with mud.

¶ 27     S.B. then ran into defendant's house to wash the mud off. Defendant followed her into the bathroom, calling her names and telling her that she had made "a huge mistake" by going to Burford's apartment. When they got to the bathroom, defendant started crying and telling her that he loved her and that he was sorry; they started hugging. He asked her whether she "had feelings" for Burford. When she responded, he punched her hard in the face. She fell to the ground, crying. Defendant started hitting pictures on the wall, breaking the glass; he punched some of them, but he hit one with his head. This resulted in "blood[ ] everywhere." He started telling S.B. that she

"was going to pay for doing this to him." He kept punching walls, and he broke the bathroom door. S.B. tried to leave, but defendant initially blocked her. After she sat for a while with her head in her hands, he told her to leave. She walked out of the house, and she and her friends drove to school. Defendant started phoning her while she was on the way.

¶ 28 On cross-examination, S.B. said that she was aware that defendant had pleaded guilty to a count of battery based on the incident she described.

¶ 29 The State rested after S.B.'s testimony.

¶ 30 The first defense witness was defendant's father, William A. Burns (Burns). He said that defendant had always had great difficulty talking to strangers and often could not communicate by telephone at all.

¶ 31 Burns said that B.V. had stayed at his home in Decatur no more than three times before the August 2017 incident. The first time she came was about three months before the incident. Each time he encountered her, she seemed to be intoxicated. Also, three or four times before the August 2017 incident, he had been to the apartment that defendant shared with B.V. He had used the bathroom there and noticed that the door and doorframe were cracked.

¶ 32 One time when defendant and B.V. were in Decatur, Burns noticed that defendant had left his prescription bottles on his dresser. B.V. opened one of those bottles and put several pills in her mouth.

¶ 33 Burns testified that, in 2017, he owned an advertising agency and a recording studio. After defendant spent three or four thousand dollars on a sound-mixing board, Burns let him keep several valuable audio and video monitors in the apartment he shared with B.V. That equipment was in the apartment when he was present.

¶ 34     Defendant's second witness was Stull, an Aurora police officer.  He interviewed B.V. at Copley hospital.  She told him that she had worked until 2 a.m. on August 16, 2017, and then had some "running around" to do until 4 a.m.  She said that, when she got back to the apartment, defendant was angry with her because he needed the car to go to his grandmother's house.  Stull asked her if it was normal for defendant to go to see his grandmother that early; B.V. said that it was not.  B.V. never told him that defendant (1) threatened to kill her, (2) put a towel or bandanna in her mouth, or (3) followed her to the bathroom.  She did tell him that defendant bit her on the wrist.  She also said that she had been dating defendant for two years but denied that he lived with her.

¶ 35     On cross-examination, Stull agreed that B.V. told him that defendant punched her multiple times and choked her until she passed out.  Asked about B.V.'s demeanor when she was speaking, he described her as "lethargic" and "kind of dazed."  At first, she seemed to be protecting defendant; she did not want to say who was responsible for her injuries.  On redirect, he agreed that, once B.V. identified defendant as her assailant, she seemed to be forthcoming in her answers.

¶ 36     Defendant elected to testify.  He stated that he took medications for anxiety and attention deficit disorder.  He also had difficulty communicating; it was stressful for him to talk in the presence of people he did not know.  He met B.V. in May 2017.  One of her jobs was at Empire.  He moved in with B.V. within a week or so of meeting her.

¶ 37     Defendant testified that he had observed B.V. regularly using cocaine and nonprescribed Xanax and Adderall.  When the two were about 12 weeks into their relationship, B.V. asked defendant to give her his prescribed Xanax or Adderall.  She reacted angrily when he refused.  One evening about a week before the charged incident, B.V. became angry with defendant because he was out too long with the car.  She told him that she had called the police.  They were in the

bedroom; a plate and a butter knife were on the nightstand.  B.V. started slapping defendant and attacking him with the butter knife.  She struck his neck and lip with the knife.  Initially, he was focused more on calming her than on defending himself.  Once he was cut, he was more intent on self-defense.  However, because the attack was with a butter knife, he never felt seriously threatened.  Defendant identified photographs of his face and neck as accurately depicting his appearance the day after this incident.

¶ 38    Defendant testified that, on August 15, 2017, he B.V. had dinner together at about 4 p.m.  That night, they went to a friend's house in Berwyn where people were using cocaine.  When they got back to their apartment, B.V. asked defendant to let her use his Norco or Xanax to calm down from the cocaine she had taken.  When he refused, she became irate—much angrier than ever before.  She dumped a two-liter bottle of cola over his mixing board and started throwing objects at items of memorabilia that defendant had brought to the apartment.  Defendant got paper towels and started wiping the soda off the board, but B.V. grabbed a steak knife.  He tried to take the knife away from her while she struck him with her other hand.  During the struggle, they fell to the ground with defendant on top.  This allowed him to pin her and use both his hands to take the knife from her.  He got up and threw the knife toward the kitchen area.  B.V. resumed breaking objects.  The fight ended when he gave B.V. the car keys and told her to leave.  After she left, he started packing to leave, but then fell asleep on the couch.  He was awakened by a police officer.

¶ 39    Defendant reviewed Stull's photographs of the apartment.  He testified that, when he moved in, the bathroom door was already broken and B.V.'s dresser already had a panel that was not attached properly.  He also did not cause damage to the kitchen sink.  He said that some of the strewn trash in the apartment was not there when B.V. left; some of it might have been there, but

he did not put it there. After B.V. left, he packed his luggage and left it in the middle of the living room area before going to sleep. In the photographs, however, the luggage was empty.

¶ 40    Defendant denied threatening to kill B.V., punching her, or choking her. He testified that, during their relationship, he had often seen her legs uncovered. She always had heavy bruising on her legs; she said that she bruised easily.

¶ 41    On cross-examination, defendant agreed that he did not tell the police about either occasion when B.V. attacked him with a knife.

¶ 42    The defense recalled B.V. The audio recording of her statement was played for the jury, and she acknowledged that she told the detectives that defendant called and spoke to her—not that he texted her—after she left work on August 15, 2017. She also acknowledged that she did not tell the detectives that she was concussed, but only that she had a cauliflower ear and a bandage. (The audio recording is not in the record on appeal.)

¶ 43    On cross-examination, B.V. said that the incident with the butter knife had started with defendant physically attacking her, then saying that he was sorry and holding the knife to his own neck. She denied that she ever threatened defendant with a knife, held a knife to his throat, or tried to stab him. She clarified on redirect examination that the knife involved was a steak knife, not a butter knife.

¶ 44    The parties stipulated that B.V.'s timesheets at Empire showed that she worked from about 5:04 p.m. until about 10:50 p.m. on August 14, 2017; she had no other reported hours that week. The defense rested after this stipulation.

¶ 45    The State called B.V. and Stull as rebuttal witnesses. B.V. testified that, although she worked at Empire as a server, she had worked on a few occasions as a food runner and had been

paid "[u]nder the table with tips." She was certain that she worked at Empire the night of August 15, 2017. She might have worked as a food runner that night.

¶ 46 Stull testified that, when he went to the apartment on the morning of August 16, 2017, he found the door unlocked and entered. Defendant was asleep on the couch. The room was a mess, with items strewn about.

¶ 47 In its closing argument, the State asserted that S.B.'s testimony bolstered B.V.'s credibility:

"And, in fact, it wasn't just [B.V.'s] testimony you heard. You also heard [S.B.'s] testimony who also showed you exactly who this defendant is. He beats his girlfriend, that's what he does. He beats his girlfriends. He gets jealous, he gets obsessed, and then he beats them."

In its closing argument, the defense focused on indications that B.V. lied.

¶ 48 The jury sent a note to the court that read: "Drugs = unknowingly? Define knowingly." The court answered with a definition of "knowingly."

¶ 49 The jury found defendant guilty of domestic battery (striking) but not guilty of aggravated domestic battery (strangulation). Defendant moved for a new trial or a judgment of acquittal, arguing, among other things, that the court erred in allowing the use of S.B.'s testimony. Defense counsel did not offer argument on his motion, and the court denied the motion without comment. After an extensive hearing, the court sentenced defendant to 18 months' imprisonment. Defendant timely appealed.

¶ 50                                    II. ANALYSIS

¶ 51 On appeal, defendant argues that "[S.B.'s] testimony *** was not sufficiently similar to the charged offense to be more probative than prejudicial." He argues that "[t]he primary similarity to the instant case was that [defendant] was in [a] dating role with [S.B.]—a relationship that is

implicit in the domestic violence other-crimes statute itself." "[His] actions when he was [a] juvenile were done in front of others, the slap with the mud was more demeaning action than harmful, and he attempted to speak with [S.B.] about why he was upset as she seemed to be with another young man while they were dating." Further, the other-crimes evidence was admitted primarily to enhance the credibility of B.V.'s testimony, a purpose that defendant argues was improper. Last, defendant argues that the court gave insufficient weight to his youth when he assaulted S.B. and to the 10-year gap between that offense and the charged offenses. The State disagrees on all points.

¶ 52    Section 115-7.4(a) of the Code permits courts to admit "evidence of the defendant's commission of another offense or offenses of domestic violence" in any "criminal prosecution in which the defendant is accused of an offense of domestic violence." 725 ILCS 5/115-7.4(a) (West 2016). In enacting section 115-7.4, the legislature indicated its intent to allow the use of other-crimes evidence to show propensity to commit the charged crime. See *People v. Dabbs*, 239 Ill. 2d 277, 291-94 (2010)) (holding that section 115-7.4 is analogous to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2008)), a section that "revealed an intent [by the legislature] to use other-crimes evidence to protect society against sex offenders who have a propensity to repeat their crimes." (Internal quotation marks and citation omitted.) In *Dabbs*, our supreme court addressed the legislature's purpose in enacting section 115-7.4:

> "When it enacted [section 115-7.4], the General Assembly was legitimately concerned with the effective prosecution of crimes of domestic violence ***. An abuser may have a pattern of targeting victims who are vulnerable. Such a victim may be reluctant to testify against her abuser, or the effectiveness of her testimony in court may be affected by fear or anxiety. The abuser may also be adept at presenting himself as a calm and

reasonable person and his victim as hysterical or mentally ill. Evidence that the defendant has been involved in a similar incident may persuade a jury that the present victim is worthy of belief because her experience is corroborated by the experience of another victim of the same abuser." *Dabbs*, 239 Ill. 2d at 293.

¶ 53     Section 115-7.4(b) specifies:

"In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances." 725 ILCS 5/115-7.4(b) (West 2016).

"As factual similarities increase, so does the relevance, or probative value, of the other-crimes evidence." *People v. Donoho*, 204 Ill. 2d 159, 184 (2003). However, when other-crimes evidence is not offered under the exception for evidence of *modus operandi*, "mere general areas of similarity will suffice" to support admissibility. (Internal quotation marks and citation omitted). *Donoho*, 204 Ill. 2d at 184.

¶ 54     The parties agree that a court's decision to admit other-crimes evidence under section 115-7.4 is reviewed under an abuse-of-discretion standard. See *Donoho*, 204 Ill. 2d at 182 (admission of other-crimes evidence under section 115-7.3, which applies in sex-crimes cases and is analogous to section 115-7.4, is reviewed for an abuse of discretion). A trial court's ruling on the admissibility of propensity evidence is not an abuse of discretion unless its "evaluation is arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks and citation omitted.) *Donoho*, 204 Ill. 2d at 182.

¶ 55    Given what the *Dabbs* court said about the purpose of section 115-74, we reject two of defendant's contentions: (1) that what defendant calls "broad stroke 'commonalities' between the current case and [S.B.]'s testimony" are not a basis to find the two acts to be similar, and (2) that it was improper to use the other-crimes evidence to bolster B.V.'s credibility.

¶ 56    First, defendant argues that the similarities between his battery of S.B. and the charged offenses were simply characteristics common to most domestic violence offenses and not at all distinctive.  This argument appears to miss the point of propensity evidence altogether.  If one is using evidence to show that a person has a propensity towards acts of domestic violence, the fact that the acts include behaviors typical of a commonly observed pattern makes them, if anything, more indicative of a pattern of domestic violence than quirkier or more incidental similarities.  No doubt a large part of domestic violence between romantic partners involves the abuser expressing jealousy and becoming violent in response to the other partner's perceived transgression against the abuser's expectations.  That this is a typical pattern simply means that the evidence tended to show that defendant was a typical domestic abuser.

¶ 57    Moreover, in downplaying the similarities between the offenses, defendant presents an inaccurate picture of the offense against S.B.  He focuses on the first part of the incident, in which he slapped mud against her face, something he suggests was more embarrassing than serious.  He ignores the second part of the incident in which he struck S.B. in the face hard enough to knock her down and then started punching pictures.  S.B.'s testimony about the latter part of the incident mirrored B.V.'s testimony that defendant struck her in the face and then started destroying things in the apartment.

¶ 58    Defendant argues this case "is analogous to [*People v. Johnson*, 406 Ill. App. 3d 805 (2010)], in which [the First District] determined that two sexual assaults were not significantly

similar where they involved different victims, where one assault involved the use of a car, and where the victims alleged the assaults were carried out on different parts of the body." We do not deem *Johnson* to be dispositive. We are doubtful of *Johnson*'s reasoning, and, in any event, we find the case distinguishable.

¶ 59 At issue in *Johnson* was whether evidence of the defendant's "involvement in an uncharged sexual assault was inadmissible to prove his propensity to commit sexual offenses under section 115-7.3 of the Code." *Johnson*, 406 Ill. App. 3d at 807. The central question, given that the other-crimes evidence met the "preliminary statutory requirements," was whether "its probative value was not substantially outweighed by its prejudicial effect." *Johnson*, 406 Ill. App. 3d at 809. The *Johnson* court stated, "The key to balancing the probative value of other crimes evidence to prove propensity against its possible prejudicial effect is to avoid admitting evidence that entices a jury to find defendant guilty *only* because it feels he is a bad person deserving punishment." (Emphasis in original. Internal quotation marks and citation omitted.) *Johnson*, 406 Ill. App. 3d at 809.

¶ 60 In the uncharged assault in *Johnson*, the victim was walking when a car pulled into an alley and blocked her path. *Johnson*, 406 Ill. App. 3d at 807. A person, whom she identified as defendant, pulled her into a car and started removing her clothing. *Johnson*, 406 Ill. App. 3d at 807-08. The car's driver, an unidentified male, drove the car to an abandoned building. *Johnson*, 406 Ill. App. 3d at 808. The defendant and the driver pulled her into the building. *Johnson*, 406 Ill. App. 3d at 808. Defendant stripped the victim; the driver put his penis in her mouth, and the defendant penetrated her with his penis vaginally, anally, and orally. *Johnson*, 406 Ill. App. 3d at 808.

¶ 61 As to the charged offense in *Johnson*, the victim testified that the defendant grabbed her as she walked past an alley and dragged her into an abandoned building. *Johnson*, 406 Ill. App. 3d

at 806. He threatened to kill her if she did not do what he said, and he ordered her to perform oral sex on him. *Johnson*, 406 Ill. App. 3d at 806. She put his penis in her mouth, but then "told him [that] she was so scared that she might bite him." *Johnson*, 406 Ill. App. 3d at 806. The defendant then pushed her up against a wall, digitally penetrated her vagina, then placed his penis in her vagina. *Johnson*, 406 Ill. App. 3d at 806.

¶ 62    The *Johnson* court concluded that because the assaults had "significant dissimilarities" and the trial court did not measure the prejudicial effect of the prior offense, the trial court erred in admitting the section 115-7.4 evidence. *Johnson*, 406 Ill. App. 3d at 812. The court held that "the most telling difference[ ]" was that the defendant acted alone in the charged offense, whereas he had an accomplice in the uncharged offense. *Johnson*, 406 Ill. App. 3d at 811.

¶ 63    We are not fully persuaded by this analysis. Although the similarity between the two assaults was arguably not suggestive of a fixed *modus operandi*, the two were nevertheless strikingly similar. The two offenses were very much the same kind of crime: accosting a female pedestrian (a stranger), transporting her to an abandoned building, and assaulting her with more than one form of penetration. Thus, to us, the uncharged offense appeared well suited to indicating a propensity to commit the charged offense. Consequently, we are uncertain how the trial court's analysis in *Johnson* was insufficient. To be sure, we recognize that the presence of a second perpetrator could make evidence of the uncharged offense possibly more inflammatory, but that does not seem to be the basis for the *Johnson* court's rejection of the evidence.

¶ 64    In any event, *Johnson* is distinguishable. In *Johnson*, both the charged offense and the prior assault seemed to have been planned attacks; thus, it was fair to compare how the attacks were executed. Domestic violence is typically more reactive and unplanned. Similarities between offenses that go beyond what defendant calls "broad stroke 'commonalities' " are likely to be

incidental. A domestic abuser might, for instance, have a propensity to "punish" a victim for having other friends, but the specific way that propensity is manifested will likely differ from incident to incident.

¶ 65 Next, defendant argues that the propensity evidence here had the effect of improperly bolstering B.V.'s credibility. Defendant quotes *People v. Strawbridge*, 404 Ill. App. 3d 460, 468 (2010), for the proposition that " '[i]t is generally improper… to admit evidence of other crimes simply to enhance the credibility of a prosecution witness.' " What we said in *Strawbridge* was, "It is generally improper—*with some exceptions not pertinent here*—to admit evidence of other crimes simply to enhance the credibility of a prosecution witness." (Emphasis added.) *Strawbridge*, 404 Ill. App. 3d at 468. *Strawbridge* was stating the common-law rule. By contrast, the *Dabbs* court did not deem credibility-bolstering as a problem for evidence sought to be admitted under section 115-7.4. *Dabbs* recognized that propensity evidence will generally support the credibility of testimony from the victim of domestic violence. Indeed, *Dabbs* seems to have treated this as a *purpose* of section 115-7.4. *Dabbs* noted that the legislature had intended that "[e]vidence that the defendant has been involved in a similar incident may persuade a jury that the present victim is worthy of belief because her experience is corroborated by the experience of another victim of the same abuser." *Dabbs*, 239 Ill. 2d at 293. Thus, just as *Dabbs* saw section 115-7.4 an exception to the common-law rule against admission of other-crimes evidence to prove propensity, *Dabbs* also appears to have recognized section 115-7.4 as necessarily an exception to the common-law rule against admission of other-crimes evidence to bolster a witness's credibility. Therefore, cases like *Strawbridge* that address only the common-law admission of other-crimes evidence are not persuasive here.

¶ 66    Finally, defendant claims that the trial court gave insufficient weight to his youth when he assaulted S.B. and to the 10-year gap between that offense and the charged offenses.  Defendant is, of course, correct that these facts *weighed against* the admission of the propensity evidence.  However, they are not *by themselves* enough to establish an abuse of discretion, and we do not read defendant as claiming that they are.  See *People v. Lobdell*, 2017 IL App (3d) 150074, ¶ 21 (noting that proximity in time is evaluated on a case-by-case basis and that reviewing courts have upheld the admission of other-crimes evidence that was over 20 years old).  The trial court here considered the time gap[2] and concluded that it was dispositive when weighed against the similarity of the offenses.  As we see no error in the court's evaluation of the similarity of the offenses, we see no abuse of discretion in the trial court's ultimate ruling.

¶ 67                                    III. CONCLUSION

¶ 68    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 69    Affirmed.

---

[2] Defendant appears not to have argued below that his youth when committing the offense against S.B. was relevant to admissibility.